UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br> vs.<br><br>ANTHONY WARD,<br><br>     Defendant. | 5:22-CR-50073-JLV-01<br><br>REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS EVIDENCE (DOC. 38) |

  Anthony Ward filed a Motion to Suppress (Doc. 38) and memorandum in support of his Motion to Suppress (Doc. 39). The United States opposed the motion and filed a response. (Doc. 55). An evidentiary hearing was held on Wednesday, November 2, 2022. Ward was personally present and represented by his attorney of record Paul Andrews. The Government was represented by the Assistant United States Attorney Gina Nelson. Four witnesses testified at the hearing, and eleven exhibits were received into evidence. Supplemental briefings were not submitted.[1] Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

---

[1] The deadline to submit supplemental briefing was January 16, 2023.

## RECOMMENDATION

It is respectfully recommended that Ward's Motion to Suppress (Doc. 38) be denied.

## JURISDICTION

Ward is charged in an Indictment with Distribution of a Controlled Substance Resulting in Serious Bodily Injury in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2; and Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). (Doc. 1). The pending motion was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and United States District Court District of South Dakota's Local Rule (LR) 57.11(B).

## FACTUAL BACKGROUND

In December of 2021, a controlled purchase of heroin between a confidential informant and C.A. occurred at the Motel 6 in Rapid City. (Doc. 84, pp. 6, 67). In January of 2022, a source of information (SOI-1) advised that C.A. had been staying at Motel 6 with two African American males, one by the name of Low; he did not know the other individual's name. Id. at p. 7. SOI-1 also advised that there were "blues," which are blue pills disguised as oxycodone pills containing fentanyl, and guns in the hotel room. Id. at pp. 21, 44. SOI-1 also advised that C.A. would change rooms often and provided C.A.'s phone number.[2] Id.

---

[2] The cellphone number, which had Colorado area code, was confirmed to be C.A.'s phone number. Id. at pp. 7, 9. The phone toll records indicated contact

In March 2022, Rapid City Police Department responded to a call of K.S. overdosing.  Id. at pp. 9-10.  K.S.'s girlfriend told law enforcement that K.S. purchased fentanyl from C.A. and showed them Facebook messages between K.S. and C.A. corroborating this.  Id. at p. 9, lns. 22-25.  K.S. was revived by two doses of Narcan.  Id. at p. 9, lns. 14-15.  K.S. was interviewed and told officers he "went to the Motel 6 and was picked up by C.A. and an African-American male by the name of Low and had smoked the fentanyl in the vehicle before going home and overdosing."  Id. at p. 10, lns. 2-5.

On March 21, 2022, during that same week, C.A. and Darnell Young were involved in a traffic stop and were arrested.[3]  Patrick Rose, investigator with Pennington County Sherriff's Office, and Jakob Whittle, special agent for the South Dakota Division of Criminal Investigation, interviewed C.A. and Darnell Young at the Pennington County Jail.  The court finds Investigator Rose and Special Agent Whittle to be credible witnesses.

C.A. reported that "just a week prior he came back from Colorado with two African-American males. . . one was Darnell Young, who was with him during the traffic stop, and the other individual was named Joe[4] . . . He advised that they had brought back approximately 1,000 blue fentanyl pills the week prior.  In total, he said that both the African-American males had been

---

with the Motel 6 and various individuals who had prior drug arrests, including "Low" and K.S.  Id. at p. 8, lns. 22-24; p. 24, lns. 15-16.

[3] C.A. was arrested for local warrants and false impersonation.  Id. at pp. 24, 26.  Darnell Young was arrested for outstanding warrants out of Colorado.  Id. at p. 26.

[4] "Joe" was later identified to be Anthony Ward.  Id. at p. 12.

his source of supply for approximately three months, and they had transported approximately 7,000 blue fentanyl pills over those three months to Rapid City to distribute." Id. at p. 10, lns. 19-23 and p. 11, lns. 1-4.

C.A. believed that "Joe" was staying at the Hampton Inn,[5] and he was known to frequently wear a face mask. Id. at p. 57. C.A. also mentioned several other names, one being Maranza Ball. Id. at p. 79. C.A. said he was arrested with "Low" but claimed to not know his real name. Id. at p. 71. C.A. described the possible vehicle that the suspects were driving as a "red Fiesta," green truck, or jeep. Id. at p. 93.

During Darnell Young's interview, he "advised that a week prior he had come from Denver to Rapid City with C.A. and also with the female with purple hair." Id. at p. 13, lns. 6-8. Young stated that the woman with purple hair was C.A.'s girlfriend, but he did not provide her name or any physical description, aside from the purple hair. Id. at p. 36, lns. 15-16, 19-20. Young also advised he identified himself as "Joe" and there was no one referred to as "Low." Id. at p. 48. However, Agent Whittle testified he did not believe[6] Darnell Young's statements as C.A. previously told him that he was arrested with "Low."[7] Id. at p. 71.

Based on the information learned during the interviews, Investigator Rose and other law enforcement officers went to the Hampton Inn and spoke to

---

[5] Investigator Rose testified that the way C.A. described the location led him to believe it was the Hampton Inn located on Lacrosse Street. Id. at p. 12.
[6] Agent Whittle testified that he believed Darnell Young "was trying to eliminate the other subjects who we were looking for as Joe." Id. at p. 46, lns. 10-11.
[7] It was confirmed that Darnell Young was referred to as "Low." Id. at p. 48.

hotel staff. Id. at p. 14. Staff "advised that there was -- there was only one black male and a female with purple hair that had been staying at the Hampton Inn, advised the black male had a phone number from Colorado, and provided the name of the female with the purple hair[8] and what vehicle she was driving."[9] Id. at p. 14, lns. 20-24. Staff also advised that the guests in question always parked on the south side of the hotel. Id. at p. 56. Staff also said that the black male "was usually masked up and either had a hoodie or something over his head." Id. at p. 15, lns. 23-25.

Agent Whittle, Investigator Rose, and other law enforcement officers conducted surveillance of the hotel parking lot and observed a red car pull into the southwest parking lot. Id. at pp. 15, 56. A female with purple hair was in the driver's seat. "The vehicle sat there for a little bit", and then law enforcement observed the subject, "a large black male wearing a face mask and durag" "walk out of the hotel and get into the passenger seat and leave." Id. at p. 15, ln. 10-12 and p. 80. Officers attempted to follow the vehicle, but they "lost the car, so then the surveillance was terminated." Id. at p. 91.

Agent Whittle testified that three facts made him think the individual he saw exit the hotel and enter the vehicle was the person suspected of trafficking drugs with Darnell Young. Id. at p. 78. First, hotel management said that they could only think of one African American male staying at the hotel and he was known to wear a facemask and something over his head. The individual he

---

[8] The hotel room was registered to Brittany Brazile. Id. at p. 54.
[9] The vehicle was a red car, which had South Dakota license plates. Id. at p. 129.

saw walk out of the hotel was a "larger African-American male wearing a facemask . . . and durag." Id. at p. 57, lns. 24-25 and p. 84, ln. 1.  Second, the hotel room was registered under the name Brittany Brazile,[10] who had purple hair.  Id. at p. 78.  Third, the individual had a Colorado phone number.  Id.

Investigator Rose testified that the information C.A. provided during the March 21, 2022, interview was corroborated in several ways.  Id. at p. 44.  C.A. spoke about the Hampton Inn and a red car; a red car was found in the Hampton parking lot.  Id. at p. 44, lns. 3-6.  Furthermore, C.A. spoke of a female with purple hair and an African American male, and people matching that description were located at the Hampton Inn.  Id. at p. 44, lns. 7-9.

The next morning, on March 23rd, an operational briefing was held at the DCI office where the officers involved[11] were brought "up to speed on the entire investigation. . . . give[n] a brief description of the investigation and how [they] got up to this point and then the plans or the goals of the operation."  Id. at p. 59, lns. 3-5.  The identity of the black male was unknown; however, officers knew he went by "Joe," and he "was a source of supply for a nonfatal overdose in the Rapid City area."  Id. at pp. 105, 133.  It was also known that "Joe" was frequently with a female with purple hair.  Officers were also shown surveillance photos from the day before of the black male suspect and informed

---

[10] Law enforcement believed that Maranza Ball, a Rapid City resident with purple hair, was actually the woman identified to have been with C.A. and Ward.  Id. at pp. 34, 80.  Police did not know of Brittany Brazile prior to the stop Id. at p. 89.
[11] Agent Whittle, Investigator Rose, Pennington County Sergeant Casey Kenrick, Special Agent Trista Dupres, Trooper Gamber, and Trooper Jackson participated in the operational briefing.

he might be distributing drugs using a red car.  Id. at pp. 105, 135.  There was also mention of a firearm during the operational brief.  Id. at p. 150. Investigator Rose testified that the intent was to stop the vehicle regardless of whether a traffic violation occurred.[12]  Id. at pp. 16-17.

Law enforcement officers were stationed in different locations near the hotel.  Everyone involved in this operation was in communication via radio.  Id. at p. 18.  Agent Whittle was stationed in the Hampton Inn parking lot.  When he arrived, the red car was not there.  Agent Whittle went into the hotel and spoke with management who told him that they believed the suspects were still in the room, even though their vehicle was not there.  Id. at p. 60.

The officers conducted surveillance for approximately an hour.  At that point, Agent Whittle went into the Hampton Inn and "created a ruse" to get suspect to exit the hotel room.  Id. at p. 61, lns. 2-4.  Hotel staff called the room, and nobody answered.  Staff then called the phone number listed on the registration and spoke with a male.  Staff told the male that since they were not registered for the room for the next night, the room needed to be rebooked.  Id. Approximately a half hour later, the red car pulled into the parking lot.  Id.

Agent Whittle testified that he saw the red car pull up in front of him. The vehicle was occupied by two females, with the purple haired female being the driver.  Agent Whittle believed it was clear that they were "obviously waiting

_____

[12] Investigator Rose testified that law enforcement believed Maranza Ball to be the driver of the vehicle and she did not have a driver's license; therefore, "if the vehicle was not observed doing any traffic violations, then the stop would occur on the vehicle for that."  Id. at p. 37, lns. 6-10.

for somebody." Id. at p. 61, lns. 23-24.  Agent Whittle then observed the African American male, wearing the same face covering and same durag as the day before, walk out of the hotel carrying two bags.  Exhibits 7, 103, and 104.[13]

The purple haired female exited the vehicle and opened the trunk and the black male put both bags into the trunk and got into the back passenger side of the vehicle.  Id. at p. 62, lns. 10-13.  The vehicle sat there for a moment and then left the parking lot.  Id. at lns. 16-17.  Agent Whittle relayed, via officer radio, that as the vehicle was pulling out of the driveway of the hotel parking lot, it failed to stop before exiting the parking lot, as mandated by South Dakota law.[14]  Id. at pp. 62-63; Exhibit 4.[15]  The vehicle also failed to stop at a stop sign at the intersection of Rapp Street and Eglin Street, another violation of South Dakota law.[16]  Id. at p. 97.  Trooper Jackson relayed this traffic violation over the radio.  Id. at p. 149.  The court finds Special Agent Whittle and Trooper Jackson to be credible witnesses.

Trooper Jackson initiated the stop.  Id. at p. 108.  There were three occupants in the vehicle, the purple haired driver, a female in the front passenger's seat, and a black male in the backseat.  Id. at p. 137.  The driver, identified to be Brittany Brazile, appeared very agitated, "[s]he had very

---

[13] Exhibits 103 and 104 are images of Ward walking out of the hotel and towards the red car, carrying two bags.
[14] South Dakota Codified Law §32-29-2.2.
[15] Exhibit 4 is the cell phone video Agent Whittle took of the car leaving the parking lot and committing the first traffic violation.
[16] South Dakota Codified Law §32-29-2.1.

constricted pupils," and "her emotions were very volatile." Id. at p. 109. Trooper Jackson initially believed she might be under the influence of an unknown substance; however, after further investigation determined she was not.[17] Trooper Jackson asked Brittany Brazile to come sit in his vehicle. As she was there, she constantly brought up and became very emotional about an open wound on her body from a cancer lesion. Id. at p. 109. She also made comments about not wanting to go to jail, even though the questions did not pertain to going to jail. Id. at p. 110.

Trooper Jackson testified that the black male's demeanor displayed "messed-up kind of behaviors," including him "looking down" and displaying a if " 'I don't see them, they don't see me' mentality in [his] head." Id. at p. 129 lns. 10, 13-14.

While Trooper Jackson was speaking with Brazile, Trooper Gamber arrived on scene and attempted to identify the passengers. Id. at p. 138. When Trooper Gamber first approached the vehicle, the male was not wearing a face mask. Id. at p. 154. The male first gave the name of "Kevin." Trooper Gamber asked Kevin what his last name was, and Kevin was "pretty hesitant" to give any information. Id. at p. 138. The male gave the name of "Kevin Rodney Wolffork" and a date of birth. Id. at p. 139. The male then "immediately placed a face mask over [his] face." Id. at p. 139, lns. 15-16. The female passenger denied having a driver's license but did provide a name. Id.

---

[17] Brittany Brazile had a valid driver's license, no active warrants, and no ATLs. The vehicle, registered to "Russell," had a valid registration and was not reported stolen. Id. at p. 129, lns. 15-16.

at p. 138. Trooper Gamber ran the name of both individuals into the NCIC.[18]
Id. He was unable to obtain information on "Kevin Rodney Wolffork," but was
able to confirm the women's identity. Id. Trooper Gamber reapproached the
vehicle and asked the male to confirm the spelling of the name. Id. at p. 140.
The male provided a variation of the last name given and said the correct
spelling "Woolfork." This variation provided no return NCIC. Id.

Again, Trooper Gamber reapproached the vehicle and the male provided
another variation and said the name was in fact "Woolfolk." Id. at p. 141. This
variation also could not be verified through NCIC. Id.

At that point, Trooper Gamber asked the male to come into his vehicle,
which he willingly did although he was "hesitant at first." Id.; Exhibit 1.[19] The
male advised Trooper Gamber that he "had the names flipped around. So then
it was actually Rodney Kevin Woolfolk." Id. at p. 142, lns. 1-2. Trooper
Gamber continued to ask the unidentified male for his true identity.

The name "Rodney Kevin Woolfolk" did successfully identify an individual
on NCIC; however, the driver's license photo that came back did not match the
unidentified male's physical appearance. See Exhibits 5 and 6.[20] Trooper
Gamber asked the male for his social security number, and it did not match
Rodney Kevin Woolfolk's social security number. Id. at p. 116, lns. 22-24.

---

[18] The National Crime Information Center (NCIC) is a criminal records database
allowing criminal justice agencies to search for information about missing or
wanted persons and access criminal histories.
[19] Exhibit 1 is Trooper Gramber's dashcam footage.
[20] Exhibit 5 is Rodney Woolfolk's ID card and Exhibit 6 is Ward's mugshot,
which shows the difference in the two's appearance.

Rodney Kevin Woolfolk's driver's license photo showed a birthmark on the top left of his forehead.  In an effort to identify the male, Trooper Gamber testified that he asked the male to lift his durag off the "top of his forehead. The individual pulled up the right side rather than left side.  After some convincing, [Trooper Gamber] asked him to take it completely off, and he actually used his left hand to pull off the durag and, like, cover his forehead." Id. at p. 143, lns. 12-16.  The male did not have the birthmark seen in the photo.  After being confronted by the fact that the other passengers referred to him as "Joe," he admitted that people do call him that.[21]  Id. at p. 152.  At that point, the male was arrested for false impersonation.

The unidentified male was searched incident to arrest and approximately .49 ounces of raw marijuana, keys, and several cell phones was located on his person.  Id. at p. 117, lns. 10-11.  Then the vehicle was searched.

While Trooper Gamber was gathering his search gloves, the unidentified male said, "one of the bags in the cars has some money" of his and he requested to get the money, approximately $2,700, out of the two handled bag. Exhibit 4; Id. at p. 146.  Trooper Gamber asked what money and was advised the money was under lock and key, and he had the keys on his person.  Id. The male said the money was his, but the rest of the bag was not his.  Id.  He also advised he would have to get out of the patrol vehicle and get his key to

---

[21] Ward explained that in Chicago everyone calls each other "Joe," so when his cousin called him "Joe," the women in the vehicle assumed that was his name. Exhibit 4.

unlock the bag.  Id.  He then advised that the bag was actually under a combination code that he was unwilling to give to officers.  Id.

Trooper Jackson testified that he searched the vehicle and "[i]n the center console, located approximately .4 grams of suspected methamphetamine that was later field-tested . . . Inside the glove box, [he] located several cut straws that [he] recognized to be snort straws. . .  And then in the trunk of the vehicle [he] located two black bags."  Id. at p. 117, lns. 20-25 and p. 118, ln. 1. Trooper Gamber testified that he located "a plastic bag containing blue M30 pills and an unknown powder crystal-like substance that was in with it, and then a vial of an unknown liquid, along with some aluminum foil pieces that had burnt residue on it."  Id. at p. 145, lns. 11-15.  Based on his training and experience, Trooper Gamber believed the blue pills to be Fentanyl.  Id.

While searching the trunk, officers "located multiple bags with multiple numerous locks on them."  Id. at lns. 6-7.  The keys located on the unidentified male opened the bags' locks.  Trooper Jackson testified that he opened the bag and found "approximately 10 and a half ounces of raw marijuana" and a safe that contained "36 10-milligram dosages of Suboxone, and then $2,859 in U.S. currency, and then an unknown capsule, and then several other M30 pills." Id. at p. 118, lns. 18-19, 23-25.  The bag also contained "testosterone supplements and male garments."  Id. at p. 154, lns. 22-23.  Also in the trunk was a plastic bag that was a high-point pistol with a serial number that was found to be stolen out of Pine Ridge.  Id. at lns. 16-18.

The unidentified male never provided his correct name on scene, and he was transported to the Pennington County Jail.  Id. at p. 65, lns. 21-25 and p. 66, lns. 1-3.  While at the jail, the male removed everything out of his pockets and there was a Colorado driver's license for Rodney Kevin Woolfolk Junior "wrapped up in a white paper, like, folded up in a piece of white paper."  Id. at p. 151, lns. 14-25 and p. 152, lns. 4-12.  The male was identified as Anthony Ward through fingerprints.  Id. at p. 65, lns. 24-25.

## **DISCUSSION**

Ward filed the present Motion to Suppress arguing "the evidence found as a result of the stop, seizure, and search of the vehicle and persons, and any statements made by the Defendant in regard to the same must be suppressed, as taken in violation of his rights."  (Doc. 38, p.1).  First, he argues that the traffic stop violated his Fourth Amendment Right against unreasonable search and seizure.  Id.  He further asserts that the subsequent search of the car was conducted in violation of his Fourth Amendment right.  Id.  Finally, Ward states that statements he gave were taken in violation of his Fifth Amendment Right against self-incrimination, citing Miranda v. Arizona, 384 U.S. 436 (1966).  The court will address each argument separately.

### **I.    Probable Cause Existed to Stop the Vehicle**

Ward "asserts that the traffic stop of a car in which he was a passenger violated his Fourth Amendment Right against unreasonable search and seizure."  (Doc. 38, p.1).  Ward argues law enforcement lacked reasonable suspicion to stop the vehicle because Trooper Jackson "did not observe the

traffic violation" and "it would have been known to [Trooper Jackson] that Officer Whittle was looking for a reason to have Ward stopped."  (Doc. 39, p. 2).

The Fourth Amendment of the U.S. Constitution provides the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  In terms of the Fourth Amendment, the law is settled that "a traffic stop entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.' "  Brendlin v. California, 551 U.S. 249, 255 (2007) (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979)).

"For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest. . . . As such, a traffic stop is governed by the principles of Terry v. Ohio . . . ."  United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (citing Berkemer v. McCarty, 468 U.S. 420, 439 (1984); Terry v. Ohio, 392 U.S. 1 (1968)).  The constitutional analysis under Terry is two-part: (1) "whether the officer's action was justified at its inception," and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  Terry, 392 U.S. at 20.  Ward does not argue that the scope of the traffic stop was unreasonable; thus, the only issue was whether the stop was justified at its inception.

To be valid pursuant to the Fourth Amendment, a traffic stop "must be supported by reasonable suspicion or probable cause."  United States v. Houston, 548 F.3d 1151, 1153 (8th Cir. 2008) (internal citations omitted).  A

law enforcement officer has reasonable suspicion when the officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed. United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994).

The more rigorous standard of probable cause exists when the totality of the circumstances justifies the belief that a crime has been committed and the person being seized committed it. Id. (internal citations omitted). "An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation. This is true even if a valid traffic stop is a pretext for other investigation." United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) (internal quotations omitted). Nonetheless, the police must "objectively ha[ve] a reasonable basis for believing that the driver has breached a traffic law." United States v. Thomas, 93 F.3d 479, 485 (8th Cir. 1996).

"When multiple officers are involved in an investigation, probable cause may be based on their collective knowledge and need not be based solely on the information within the knowledge of the arresting officer as long as there is some degree of communication." United States v. Robinson, 664 F.3d 701, 703 (8th Cir. 2011); United States v. Edwards, 891 F.3d 708, 711-12 (8th Cir. 2018); United States v. Gonzales, 220 F.3d 922, 925 (8th Cir. 2000).

The requirement that there is some degree of communication "serves to distinguish between officers functioning as a 'search team' and officers acting as independent actors who merely happen to be investigating the same subject." United States v. Gillette, 245 F.3d 1032, 1034 (8th Cir.). The Eighth

15

Circuit Court of Appeals has "never required that all the relevant collective knowledge of the team be communicated to the officer who made the stop, the arrest, or the search at issue.  <u>Robinson</u>, 664 F.3d at 703-04 (citing <u>United States v. Winters</u>, 491 F.3d 918, 920-21 (8th Cir. 2007); <u>Gillette</u>, 245 F.3d at 1034); <u>see</u> <u>United States v. Jacobsen</u>, 391 F.3d 904 (8th Cir. 2004) (holding the patrol officer himself need not know the specific facts that caused the stop; rather, the officer need only rely upon an order that is founded on reasonable suspicion); <u>United States v. Rowe</u>, 878 F.3d 623, 628 (8th Cir. 2017); <u>Whren v. United States</u>, 517 U.S. 806, 806 (1996) (holding "constitutional reasonableness of traffic stops does not depend on the actual motivations of the individual officers involved").

### A. Investigation

Probable cause for stopping the vehicle existed on the basis of the drug investigation alone.  Several law enforcement agencies spent several weeks investigating C.A., Darnell Young, and Anthony Ward for distributing fentanyl in Rapid City, as detailed above in the facts section.

"To support a probable cause determination, officers may rely on an informant's tip if the informant has provided reliable information in the past or if his tip is independently corroborated."  <u>United States v. Hambrick</u>, 630 F.3d 742, 747 (8th Cir. 2011).  C.A. provided information that was "independently corroborated" via the officer's investigation.  Investigator Rose testified that the information C.A. provided during the March 21, 2022, interview was corroborated in several ways.  (Doc. 84, p. 44).  Primarily, C.A. identified

16

person involved with drug trafficking to be at the Hampton Inn and a red car; a red car was found in the Hampton Inn parking lot.  Id. at p. 44, lns. 3-6.  Furthermore, C.A. described a female with purple hair and an African American male, being involved with drug trafficking, and people matching that description were located at the Hampton Inn.  Id. at p. 44, lns. 7-9.  Also, C.A. admitted his own wrongdoing in collaboration with Joe and Darnell Young to traffic over 7,000 blue fentanyl pills in approximately three months.  (Doc. 84, p. 10, lns. 19-23 and p. 11, lns. 1-4).

Trooper Jackson was able to rely on the information he learned at the operational briefing, under the collective knowledge doctrine, to form probable cause to stop the vehicle.  When Agent Whittle saw the red car pull up, with a purple haired female driving, and observed the African American male, wearing the same face covering and durag as the day before, walk out of the hotel carrying two bags, he believed the male to be "Joe" and relayed his observations via the radio.  Exhibits 7, 103, and 104.

Based on the corroborated information from C.A. coupled with Agent Whittle's observations that day, probable cause existed because the totality of the circumstances justified the belief that a crime had been committed, namely the distribution of fentanyl, and the person being seized, Ward, committed it.[22] Bloomfield, 40 F.3d at 915.

---

[22] At a minimum, reasonable suspicion to stop the red car is present as the officers were aware of "particularized, objective facts," namely the information confirmed from C.A. combined with the observations on the day of arrest, "which, taken together with rational inferences from those facts, reasonably

### B. Traffic Violations

Alternatively, there was also probable cause to stop the red car based on the violation of two traffic laws. The Eighth Circuit Court of Appeals has been clear: when an officer observes even a minor traffic violation, there is probable cause to search the vehicle, even if the traffic stop is a pretext for another investigation. United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) (internal quotations omitted).

Thus, the fact that Trooper Jackson was looking for a reason to stop Ward is irrelevant. It is also irrelevant that Trooper Jackson did not personally observe the traffic violations, because the collective knowledge doctrine allows officers, who are in communication with each other, to base their probable cause off the information of others. Doc. 84 at pp. 18, 62-63, 149; Exhibit 4; Robinson, 664 F.3d at 703. Therefore, Trooper Jackson can rely on the information regarding the two traffic violations transmitted over the police radio as the basis for probable cause. Therefore, the stop of the vehicle based on the two traffic violations was valid.

Additionally, there was probable cause to stop the vehicle under the mistaken belief that the driver of the vehicle was driving without a driver's license, a violation of South Dakota law.[23] If the officer's suspicion was based upon a mistaken belief as to either law or fact, so long as the mistake itself was objectively reasonable, the stop is valid. United States v. Smart, 393 F.3d 767,

---

warrant suspicion that a crime is being committed," specifically the distribution of fentanyl. Id.

[23] South Dakota Codified Law § 32-12-22.

770 (8th Cir. 2005) (reasonable suspicion exists despite mistake of fact as to the state license plate on the vehicle and mistake of law as to the state's requirement for front and back plates).

The mistake of fact regarding the purple haired female's identity was reasonable. First, C.A. provided the name of Maranza Ball while being interviewed. Id. at p. 79. Second, multiple sources of information, including C.A. and Ward's own confessions, indicated that a woman with purple hair was known to be dealing fentanyl with C.A. and Ward. Id. at p. 34; 80. Third, Maranza Ball's prior booking photo showed she had purple hair, matching the physical description provided. Id. at p. 55, lns. 20-22. Fourth, it is common for individuals dealing drugs out of hotels "to register under a false or assumed name" rather than the person's real name. (Doc. 84, p. 45, lns. 15-25).

Maranza Ball did not have a valid driver's license. Id. at p. 37, lns. 6-10. Thus, even if the vehicle was not observed doing any traffic violations, nor was there any reason to stop the vehicle from the drug investigations, probable cause to stop the vehicle could have occurred on the mistaken belief of Maranza Ball being the driver and driving without a license.

## II.    Probable Cause Existed to Search the Car

Ward argues that police lacked probable cause to search the vehicle as the "marijuana found on him does not meet any exception that allowed law enforcement to then search the entire vehicle." (Doc. 39, p. 3).

The Fourth Amendment guarantees the right to be secure in one's person and house and protects against unreasonable searches and seizures. However,

"Fourth Amendment rights are personal . . . [and] may not be vicariously asserted." United States v. Douglas, 744 F.3d 1065, 1071 (8th Cir. 2014) (internal quotations omitted).

Only those with a reasonable expectation of privacy in the place searched may bring a Fourth Amendment challenge. Minnesota v. Carter, 525 U.S. 83, 88 (1998). The defendant moving to suppress has the burden of establishing he "had a legitimate expectation of privacy in the area searched or the item seized." United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994). The defendant must "present evidence of his standing, or at least point to specific evidence in the record which the government presented that established his standing." United States v. Maxwell, 778 F.3d 719, 732 (8th Cir. 2015). There is no "single metric or exhaustive list of considerations," but a defendant must show "(1) a subjective expectation of privacy, and (2) the expectation is objectively reasonable." United States v. Williams, 521 F.3d 902, 906 (8th Cir. 2008); see Byrd v. United States, 138 S. Ct. 1518, 1527 (2018) (holding a defendant's expectation of privacy must be grounded in property law or understandings that are recognized by society).

Numerous Eighth Circuit cases have observed that "[g]enerally a mere passenger generally does not have standing to challenge a vehicle search where he does not have a 'property or possessory interest in the vehicle.' " United States v. Anguiano, 795 F.3d 873, 878-79 (8th Cir. 2015) (holding that when a passenger has no evidence that they had consent or permission from the owner, there is no standing, regardless of whether they were previously a

passenger); <u>United States v. Barragan</u>, 379 F.3d 524, 529-30 (8th Cir. 2004) (holding a passenger whose "name did not appear on any ownership documents and . . . did not have an ownership interest" in the vehicle lacked standing to challenge the search of the vehicle"); <u>United States v. Marquez</u>, 605 F.3d 604, 609 (8th Cir. 2010); <u>United States v. Green</u>, 275 F.3d 694, 698-99 (8th Cir. 2001).

In cases where bags with contraband were found in the vicinity of where defendant was sitting in a vehicle and defendants argued standing because of the vicinity, courts have still focused on property and ownership interest in the vehicle itself.  See <u>United States v. $32,780.00 in United States Currency</u>, No. 8:15CV131, 2015 WL 13732188 (D. Neb. Sept. 30, 2015).

In <u>$32,780.00</u>, the defendant, the back passenger in a rental vehicle told law enforcement that he had approximately $30,000 in the vehicle and told them where to find it in the vehicle in his personal bag.  <u>$32,780.00 in United States Currency</u>, No. 8:15CV131, 2015 WL 13732188, *2.  Law enforcement found the canvas bag on the right rear passenger floorboard and defendant claimed ownership of the bag.  <u>Id.</u> at *3.  The court held that defendant lacked standing to challenge the search of the rental vehicle, even though defendant presented evidence of brief and limited use of the vehicle with the renter's permission over the course of a multi-day trip.  <u>Id.</u> at *4.  The court held that the limited use was insufficient to give rise to a legitimate and reasonable expectation of privacy.  <u>Id.</u>

Even when evidence located on or around the passengers provides probable cause for the search of the vehicle, the passenger still lacks standing. United States v. Russell, 847 F.3d 616, 618 (8th Cir. 2017). In Russell, officers found a small bag of marijuana on the defendant (the passenger) and smelled marijuana coming from the vehicle, so the officer searched the vehicle and found a gun on the passenger side. Id. The vehicle was a rental car leased to the defendant's girlfriend but driven by another woman. Id. Defendant failed to present any evidence that his girlfriend permitted him to drive the vehicle or that he had any other possessory control over the vehicle, so the court held that he failed to establish a reasonable expectation of privacy in the vehicle and therefore had no standing to challenge the search. Id. at p. 619.

**A. Ward Lacks Standing**

Ward lacks standing to challenge the search because he failed to establish his burden that he "had a legitimate expectation of privacy in" the red car. Gomez, 16 F.3d at 256. Fourth Amendment rights are personal and may not be vicariously asserted. Douglas, 744 F.3d at 1071.

Like in $32,780.00, where the court found the limited use of possession of a backpack insufficient to give rise to a legitimate and reasonable expectation of privacy, Ward's claimed ownership over the suitcase where some of the contraband was taken from is also insufficient to give rise to a legitimate and reasonable expectation of privacy. $32,780.00 in United States Currency, No. 8:15CV131, 2015 WL 13732188.

Similar to <u>Russell</u>, Ward's possession of marijuana was a basis for probable cause, although not the only basis, to search the vehicle. In <u>$32,780.00</u> and <u>Russell</u> the court focused on whether defendant had presented evidence that they had permission to use the vehicle. Here, Ward failed to present any evidence that he owned or had any type of property or exercise any possessory control over the red car, nor that he was even permitted to drive or exercise control over the vehicle, as when the vehicle was stopped Ward was in the rear passenger seat and did not produce a driver's license. As a passenger without a property or possessory interest, Ward did not have a reasonable expectation of privacy in the vehicle.

Even if the defendant lacked standing, he "may still challenge the search if he was unreasonably seized during the traffic stop and the seizure caused an unlawful search." <u>Wise</u>, No. 4:20-CR-40104-KES-02, 2022 WL 1085303, at *8 (D.S.D. Jan. 28, 2022) (quoting <u>United States v. Davis</u>, 943 F.3d 1129, 1132 (8th Cir. 2019)).

### B. The Traffic Stop Was Not Unreasonably Extended

A passenger, who lacks standing to search, may suppress evidence found in a vehicle search when an unreasonably extended traffic stop causes the search." <u>Id.</u> (citing <u>United States v. Peralez</u>, 526 F.3d 1115, 1121 (8th Cir. 2008)). The Fourth Amendment allows for certain unrelated investigations without improperly extending the detention, meaning an officer may ask questions unrelated to the traffic stop if they do not prolong the traffic stop. <u>Rodriguez v. United States</u>, 575 U.S. 348, 354-55 (2015); <u>Arizona v. Johnson</u>,

555 U.S. 323, 333 (2009).  Only if an unreasonably extended traffic stop was

"at least a but-for cause of obtaining the evidence" is suppression of evidence

the appropriate remedy.  United States v. Olivera-Mendez, 484 F.3d 505, 511

(8th Cir. 2007) (citing Hudson v. Michigan, 547 U.S. 586, 592 (2006)); Segura

v. United States, 468 U.S. 796, 815 (1984)).  Therefore, even absent a showing

that Ward had a reasonable expectation of privacy in the vehicle, he has

standing to challenge the legality of his detention and any search that resulted.

 The court must determine if the stop was unreasonably extended.

"Whether an officer has reasonable suspicion to expand the scope of a traffic

stop is determined by looking at the totality of the circumstances, in light of the

officer's experience."  United States v. Gill, 513 F.3d 836, 844 (8th Cir. 2008).

The Eighth Circuit has repeatedly held that:

> [I]f a defendant is detained incident to a traffic stop, the officer
> does not need reasonable suspicion to continue the detention until
> the purpose of the traffic stop has been completed.  Occupants . . .
> may be detained while the officer completes a number of routine
> but somewhat time-consuming tasks related to the traffic violation.
> These tasks can include a computerized check of the vehicle's
> registration and the driver's license and criminal history, as well as
> the reparation of a citation or warning.  The officer may also ask
> questions about the occupant's travel itinerary.

United States v. Gunnell, 775 F.3d 1079, 1083-84 (8th Cir. 2015) (quoting

United States v. Ovando-Garzo, 752 F.3d 1161, 1163-64 (8th Cir. 2014)).  A

reasonable investigation also includes "requesting the driver to sit in the patrol

car to answer questions, verifying the driver's identification and related

documents, and asking questions about the driver's itinerary."  United States

v. McCarty, 612 F.3d 1020, 1024-25 (8th Cir. 2010) (citing United States v.

Ward, 484 F.3d 1059, 1061-62 (8th Cir. 2007), and Jones, 269 F.3d at 924-25).  "The scope of the traffic stop can be expanded if the driver's answers and behavior 'support suspicions unrelated to the traffic offense.'"  McCarty, 612 F.3d at 1025 (citing Ward, 282 F.3d at 1062).

   After the initial stop is completed, an officer may only continue to detain occupants of a vehicle if the officer is aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed."  Id. (quoting United States v. Shafer, 608 F.3d 1056, 1062 (8th Cir. 2010)).

   Although the Supreme Court has not explicitly held that inquiry into a passenger's identity is permissible, numerous lower courts, including the Eighth Circuit, have held that questions relating to the identity of a passenger are routine and ordinary inquiries incident to a traffic stop do not improperly extend a traffic stop.  See United States v. Roberts, 687 F.3d 1096, 1099-100 (8th Cir. 2012) (holding that the traffic stop was not prolonged when the officer turned his focus away from the initial purpose of the stop and toward the identity and warrant status of the vehicle's passengers); United States v. Edmisten, 208 F.3d 693, 694 (8th Cir.2000) (an officer is entitled to conduct a reasonable investigation related to the traffic stop by asking the driver about the identity of his passenger, and questioning the passenger to verify the information provided by the driver); United States v. Cheng Kong Yang, 432 F. Supp. 3d 957 (D.N.D. 2020) (finding where law enforcement question the identity of a passenger, the relationship among the passengers, where the two

had met, and the length of their marriage to not improperly extend a traffic stop).

Here, from the limited facts provided, the officers' discussions and actions did not unreasonably prolong the traffic stop. First, when Trooper Jackson first approached the vehicle, the driver, Brittany Brazile, appeared very agitated,[24] "[s]he had very constricted pupils," and "her emotions were very volatile." (Doc. 84, p. 109). Therefore, Trooper Jackson reasonably believed she maybe under the influence of an unknown substance; however, after further investigation he determined she was not. During the course of the investigation, Brittany Brazile continued to display odd behaviors including becoming very emotional about not wanting to return to jail and continuously discussing her opened cancer lesion. Id. at pp. 109-110. The investigation into the driver's sobriety and other behaviors took time.

The backseat male displayed "messed-up kind of behaviors," including putting a face mask over his face while Trooper Gamber was trying to identify him. Id. at pp. 129, 154. When asked to identify himself, the male only provided a first name and was "pretty hesitant" to give more information. Id. at p. 138. Then he provided three names, similar in spelling, that provided no

---

[24] Though nervous behavior and high pulse rate can contribute to a finding of reasonable suspicion, the Eighth Circuit has cautioned against undue reliance on similar factors, stating it "certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer." United States v. Jones, 269 F.3d 919, 929 (8th Cir. 2001) (internal quotation marks omitted). However, this does not prevent, an officer from investigating into a driver's suspicious behaviors. Nor does an officer's investigation into a driver's suspicious behaviors unreasonably extend a traffic stop.

return in NCIC.  Finally, a name did successfully identify an individual on

NCIC; however, the driver's license photo that came back did not match the

unidentified male's physical appearance.  Eventually, the unidentified male

was arrested for false impersonation.  Ward's failure to provide a correct name

expanded the scope of the investigation.

Officers had probable cause to search the vehicle based on the finding of

marijuana on Ward's person and the initial drug investigation, as the totality of

the circumstances suggested that the vehicle contained contraband.  Therefore,

officers did not unreasonably extend the scope of the traffic stop.

**C. Automobile exception**

Ward claims that no exception to the warrant requirement applies and

the "small amount of marijuana on him" could not be a basis for a search of

the entire vehicle.  (Doc. 39, p. 2).  The United States asserts the search falls

within the automobile exception.  (Doc. 55, pp. 18-21).  Where a warrantless

search occurs, the burden is on the United States to show by a preponderance

of the evidence that an exception to the warrant requirement applies.  United

States v. Cedano-Medina, 366 F.3d 682, 684 (8th Cir. 2004).

The automobile exception to the warrant requirement requires the United

States to demonstrate, at the time of the search, they had probable cause to

believe the vehicle contains contraband or other evidence of a crime, and not

merely at some earlier time.  United States v. Kennedy, 427 F.3d 1136, 1140-

41 (8th Cir. 2005) (citing United States v. Formaro, 152 F.3d 768, 771 (8th Cir.

1998)).  "There is no fixed formula for determining when information has

become stale." United States v. Smith, 266 F.3d 902, 904 (8th Cir. 2001). Rather, the timeliness of the information depends on the circumstances of the case, including the nature of the crime under investigation, and the property sought in the search. United States v. Gibson, 123 F.3d 1121, 1124 (8th Cir. 1997).

To determine if probable cause was present, courts should consider all relevant circumstances and apply a "common-sense approach." Kennedy, 427 F.3d at 1141 (citing United States v. Gleich, 397 F.3d 608, 612 (8th Cir. 2005)); see Texas v. Brown, 460 U.S. 730, 742 (1983) (holding "probable cause is a flexible, common-sense standard.  It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." (internal citation omitted)).

The court need not, and indeed must not, inquire into the subjective intentions of officers in making the determination for probable cause; instead, the court reviews what information was available to officers at the time of the search from the perspective of a hypothetical reasonable officer.  Devenpeck v. Alford, 543 U.S. 146, 153 (2004) ("an arresting officer's state of mind . . . is irrelevant to the existence of probable cause").  "Probable cause exists when the facts available to an officer would warrant a person of reasonable caution to believe that contraband or other evidence of a crime is present."  See Daniel, 809 F.3d 447, 448-449 (8th Cir. 2016) (internal citations omitted).  Probable

cause requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity." United States v. Neumann, 183 F.3d 753, 756 (8th Cir. 1999) (quoting United States v. Payne, 119 F.3d 637, 642 (8th Cir. 1997)).

If probable cause exists in support of the automobile exception, the search may encompass the entire passenger compartment of the automobile, its trunk, and all containers, packages, and compartments located in the vehicle so long as there is probable cause to believe that the object of the search may be found there. United States v. Caves, 890 F.2d 87, 90 (8th Cir. 1989); United States v. Englehart, 811 F.3d 1034, 1042 (8th Cir. 2016).

As discussed earlier, "[p]robable cause may be based on the collective knowledge of all of the law enforcement officers involved in an investigation if . . . some degree of communication exists between them." Robinson, 664 F.3d at 703; Edwards, 891 F.3d at 711-12; Gonzales, 220 F.3d at 925.

The question before the court is whether an objectively reasonable officer, based on the information available to them at the time of the search, had probable cause to believe the vehicle contained contraband or evidence of a crime. Kennedy, 427 F.3d at 1140-41.

The traffic violations alone, while providing probable cause to conduct a traffic stop, was not probable cause to search the red car. See Arizona v. Gant, 556 U.S. 332, 344 (2009) (holding that there was no probable cause to search a vehicle where "[Defendant]" was arrested for driving with a suspended license –

an offense for which police could not expect to find evidence in the passenger compartment of [Defendant's] car").

Ward claims the vehicle search cannot be founded based on the "small amount of marijuana on him" and could not be a basis for a search of the entire vehicle.  (Doc. 39, p. 2).  However, probable cause to search the vehicle existed even prior to the vehicle being stopped based on the drug investigation, as there was belief, under a common-sense standard, that contraband may be found in the vehicle.  Brown, 460 U.S. at 742.

Several law enforcement agencies were investigating C.A., Darnell Young, and Anthony Ward for distributing fentanyl in Rapid City, as detailed above. C.A. provided information[25] that was "independently corroborated" via the officer's investigation.  United States v. Hambrick, 630 F.3d 742, 747 (8th Cir. 2011).

Investigator Rose testified that the information C.A. provided during the March 21, 2022, interview was corroborated in several ways.  Id. at p. 44. Primarily, C.A. spoke about the Hampton Inn and a red car; a red car was found in the Hampton Inn parking lot.  Id. at p. 44, lns. 3-6.  Furthermore, C.A. spoke of a female with purple hair and an African American male, and people matching that description were located at the Hampton Inn.  Id. at p. 44, lns. 7-9.

---

[25] Under the circumstances the information C.A. provided was timely as it was recently provided and constantly corroborated, even on the day of arrest.

"If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." United States v. Olivera-Mendez, 484 F.3d 505, 512 (8th Cir. 2007) (quoting Ross, 456 U.S. at 825).  Officers had probable cause to believe the vehicle contained contraband of distribution of fentanyl; thus, the areas which contained the contraband could be searched.  Because fentanyl can be hidden almost anywhere in the vehicle, the entire vehicle could be searched.  Neumann, 183 F.3d at 756; Payne, 119 F.3d at 642

### III.    **Miranda Warnings Were Not Required**

An individual is entitled to an advisement of Miranda when he or she is "taken into custody for questioning."  United States v. Axsom, 289 F.3d 496, 500 (8th. Cir. 2002) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)); United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990) (holding Miranda warnings are required prior to questioning "whenever a suspect is (1) interrogated (2) while in custody").  Miranda requires that the individual be advised of "his right to be free from compulsory self-incrimination and his right to assistance of counsel."  Id.

Ward provides no argument or evidence regarding his Miranda claim, nor was there any mention at the suppression hearing of any post arrest statements or any violation of Ward's fifth amendment rights.  The government "concedes the defendant was in custody for all times after he was transported from the traffic stop." (Doc. 55, p. 22).  Thus, the only question is whether Ward was interrogated.

Interrogation includes both direct questioning by officers and words or actions that officers should know are "reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Voluntary statements that are not in response to interrogation are admissible regardless of the Miranda warnings. United States v. Head, 407 F.3d 925, 928 (8th Cir. 2005).

In Barnes, a defendant was asked a clarifying question in response to a spontaneous incriminating statement that the defendant made. United States v. Barnes, 195 F.3d 1027, 1029 (8th Cir. 1999). The defendant was advised of Miranda rights and invoked his right to remain silent. Id. Officers told the defendant that he was going to be booked for possession of a firearm. Id. The defendant responded by saying he "didn't think so," and officers asked what he meant. Id. In response, the defendant made incriminating statements. Id. The Eighth Circuit Court of Appeals found the statements spontaneous and "the officer's remark to [the defendant] that he was going to be charged with possession of a firearm was a statement of fact, not the functional equivalent of interrogation." Id.

In this case, although the United States claims Miranda warning were provided (Doc. 55, p. 22), there has been no evidence to support this claim. The sole issue is whether Ward was interrogated; thus, requiring the Miranda warnings.

It is clear that Ward made a number of statements to law enforcement; however, all of the statements, shown in evidence, were spontaneous and not

the result of an interrogation.  Exhibit 1, Trooper Gamber's dashcam video, is the audio of Ward's statements made while being detained in the back of the patrol vehicle.  There is no other evidence of any statements Ward made.

First, Ward repeatedly asked if he could "check the bags" and requested that money be removed from the bag.  Exhibit 1, 1:06; 1:26.  Trooper Gamber asked clarifying statements about where the money was located, similar to Barnes where the officer asked a clarifying question of fact in response to the Defendant's spontaneous statement.  Barnes, 195 F.3d at 1029.

Ward also advised that he "knows law" and "will beat all the charges in court" as "all the evidence will be excluded" because it was an "illegal search and seizure and the evidence will be "excluded under fruits of the poisonous tree, res judicata, collateral estopal." Id. at 1:41. This statement was also spontaneously made.

Ward asked officers to loosen his handcuffs and whether they are "required to wear body cams." Id. at 1:47. He asked where his keys, bags, and money would be stored.  Finally, when pulling up to the DCI office, Ward asked "where am I."  These statements were also spontaneously made.

While being transported to DCI, Trooper Gamber asked whether Ward wanted his seatbelt on. Id. at 1:41. This is far from a question that is "reasonably likely to elicit an incriminating response from the suspect," which would require the Miranda warning.  Innis, 446 U.S. at 301.

Although Ward was in custody, all of his statements were spontaneous and not the result of interrogation; therefore, Miranda warnings were not required.  Thus, no Fifth Amendment violation occurred.

## CONCLUSION

For the foregoing reasons, it is respectfully recommended that the Motion to Suppress (Doc. 38) be denied.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 24th day of January, 2023.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge